IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

REGINALD WILLIAMS, M.D. and          *
NICOLE WILLAIMS,
                                     *
        Plaintiffs,
                                     *
vs.                                         CASE NO. 4:11-CV-28 (CDL)
                                     *
COLUMBUS REGIONAL HEALTHCARE
SYSTEM, INC., et al.,                *
                                     *
        Defendants.                  *

───────────────────────────

O R D E R

    Plaintiff  Reginald  Williams,  M.D.  ("Williams")  is  a
surgeon.   The  claims  in  this  action  arise  from  the  suspension
of  Williams's  medical  privileges  at  two  hospitals  in  Columbus,
Georgia.   Presently  pending  before  the  Court  are  the  Motion  to
Dismiss  of  Defendants  Columbus  Regional  Healthcare  System,
Doctors  Hospital,  the  Medical  Center,  Andrew  Morley,  Lance
Duke,  Kevin  Sass,  Howard  Weldon,  Larry  Hung,  Charles  Ray,
Richard  Wilson,  James  Miller  and  Scott  Hannay  (collectively,
"Columbus  Regional  Defendants")  (ECF  No.  19)  and  the  Motion  to
Dismiss  of  Skip  Freedman  and  AllMed  Healthcare  Management
(collectively,  "AllMed  Defendants")  (ECF  No.  27).   Also  before
the  Court  is  the  Motion  to  Strike  of  the  Columbus  Regional
Defendants  (ECF  No.  21).   For  the  reasons  set  forth  below,  the
Motions  to  Dismiss  are  granted  as  to  Williams's  federal  law

claims.    The   Court   declines   to   exercise   supplemental jurisdiction  over  Plaintiffs'  state  law  claims,  and  those claims  are  dismissed  without  prejudice.    The  Columbus  Regional Defendants' Motion to Strike is moot.

MOTION TO DISMISS STANDARD

When  considering  a  12(b)(6)  motion  to  dismiss,  the  Court must  accept  as  true  all  facts  set  forth  in  the  plaintiff's complaint  and  limit  its  consideration  to  the  pleadings  and exhibits  attached  thereto.    *Bell  Atl.  Corp.  v.  Twombly*,  550 U.S.  544,  556  (2007);  *Wilchombe  v.  TeeVee  Toons,  Inc.*,  555 F.3d  949,  959  (11th  Cir.  2009).    "To  survive  a  motion  to dismiss,  a  complaint  must  contain  sufficient  factual  matter, accepted  as  true,  to  'state  a  claim  to  relief  that  is plausible  on  its  face.'"    *Ashcroft  v.  Iqbal*,  556  U.S.  662, ____,  129  S.  Ct.  1937,  1949  (2009)  (quoting  *Twombly*,  550  U.S. at  570).    The  complaint  must  include  sufficient  factual allegations  "to  raise  a  right  to  relief  above  the  speculative level."    *Twombly*,  550  U.S.  at  555.    "[A]  formulaic  recitation of  the  elements  of  a  cause  of  action  will  not  do[.]"    *Id.* Although  the  complaint  must  contain  factual  allegations  that "raise  a  reasonable  expectation  that  discovery  will  reveal evidence  of"  the  plaintiff's  claims,  *id.*  at  556,  "Rule  12(b)(6) does  not  permit  dismissal  of  a  well-pleaded  complaint  simply because  'it  strikes  a  savvy  judge  that  actual  proof  of  those

facts is improbable,'" *Watts v. Fla. Int'l Univ.,* 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting *Twombly,* 550 U.S. at 556).

FACTUAL ALLEGATIONS

Williams makes the following allegations, which the Court accepts as true for purposes of the present motions.

## I.   The Parties

Williams, who is black, is a board certified general surgeon who is licensed to practice medicine in Georgia. Am. Compl. ¶¶ 1, 26, ECF No. 2. Defendant Columbus Regional Health Care System ("Columbus Regional") owns and operates several health care facilities, including Defendant Doctors Hospital and Defendant the Medical Center, which are hospitals in Columbus, Georgia. *Id.* ¶ 3. Doctors Hospital and the Medical Center are separate entities that operate under the same board of directors. *Id.* ¶ 4. Defendant Howard Weldon, M.D. ("Weldon") is a general surgeon who is a member of the medical staff at Doctors Hospital. *Id.* ¶ 7. In January 2010, Weldon was appointed chairman of surgery at Doctors Hospital. *Id.* ¶ 19. Defendant Andrew Morley, M.D. ("Morley") is employed by Columbus Regional as chief medical officer for Doctors Hospital and the Medical Center. *Id.* ¶ 8. Defendant Charles Ray, M.D. ("Ray") is a radiologist who provides radiological services at Doctors Hospital. *Id.* ¶ 9.

Defendant Larry Hung, M.D. ("Hung") is a pathologist who provides pathology services at Doctors Hospital. *Id.* ¶ 10. Defendant Scott Hannay, M.D. ("Hannay") is a general surgeon who is chief of staff of the Medical Center. *Id.* ¶ 11. Defendant James Miller, M.D. ("Miller") is a physician who is also president of the Columbus Clinic. *Id.* ¶ 12. Defendant Richard Wilson, M.D. ("Wilson") is a surgeon who practices in Columbus. *Id.* ¶ 13. Defendant Lance Duke ("Duke") is CEO of the Medical Center. *Id.* ¶ 14. Defendant Kevin Sass ("Sass") is CEO of Doctors Hospital. *Id.* ¶ 15. During the relevant timeframe, Weldon, Ray, Hung and Sass were members of Doctors Hospital's medical executive committee. *Id.* ¶ 16. In addition, Weldon, Ray, Miller and Wilson were members of Doctors Hospital's credentials committee. *Id.* ¶ 18. Hannay and Duke were members of the medical executive committee for the Medical Center. *Id.* ¶ 17.

Defendant AllMed Healthcare Management ("AllMed") is an independent review organization, and Defendant Skip Freedman ("Freedman") is AllMed's medical director. *Id.* ¶¶ 5-6.

**II. Williams's Employment and Hospital Privileges**

In December 2008, Williams accepted a position as a general surgeon at the Columbus Clinic in Columbus, Georgia. *Id.* ¶ 32. Shortly after that, he joined the medical staffs of Doctors Hospital and the Medical Center. *Id.* Williams was

4

the only surgeon in the Columbus area who was trained in and performed bariatric surgery. *Id.* ¶ 33. He was also the only surgeon who performed advanced laparoscopic general surgical procedures at Doctors Hospital. *Id.* ¶ 34. Williams began to develop a "thriving surgical practice" and was a "very popular surgeon." *Id.* ¶¶ 46-49, 53. Williams alleges that his success "inflamed Weldon's racial prejudices to the point that he decided to drive [Williams] from the medical staff." *Id.* ¶ 52.

After Weldon became chairman of surgery at Doctors Hospital in January 2010, he initiated an external review of Williams's cases even though, according to Williams, no one had expressed concern about his patient care and the review was unauthorized. *Id.* ¶¶ 54-55. During the first part of 2010, Weldon and Morley sent the medical records of six of Williams's patients to AllMed for review. *Id.* ¶¶ 62, 71. According to Williams, Freedman presented the reviewing surgeons "with leading and loaded questions to answer" about the care the patient had received, and Freedman "either withheld material documents from the surgeon" or induced him to make "factually false assertions about the patient's clinical findings." *Id.* ¶¶ 64-65, 71-72. Freedman sent reports containing the surgeons' findings to Columbus Regional; the reports were critical of Williams. *Id.* ¶¶ 66,

72-73.    Williams    contends    that    the    reports    "contained factually false, defamatory statements."  *Id.* ¶ 73.

The AllMed reports were "republished" to Duke, Hannay, Sass,   the   professional   affairs   committee   of   Columbus Regional's board, and several committees at both the Medical Center   and   Doctors   Hospital,   including   the   credentials committees  and  the  medical  executive  committees.   *Id.* ¶ 75. Williams  was  not  given  an  opportunity  to  respond  to  the reports.   *Id.* ¶ 79.   Based  on  the  reports,  both  hospitals imposed   a   "three-month,   non-reportable   proctorship"   on Williams's   medical   privileges,   though   the   proctorship   did exclude  certain  procedures,  such  as  Lap  Band  surgeries  and endoscopies.  *Id.* ¶¶ 80-81.   The  Columbus  Clinic  continued  to support  Williams  after  this  proctorship  was  imposed.   *Id.* ¶ 180.

During  the  proctorship,  Weldon  and  Morley  sent  the medical  records  of  an  additional  ten  patients  to  AllMed.   *Id.* ¶ 82.   According  to  Williams,  the  AllMed  reviewers  had  minor criticisms  about  the  medical  management  of  these  patients. *Id.* ¶ 84.   Morley  and  Hannay  compiled  a  table  summarizing  the AllMed  reviewers'  findings  regarding  the  first  six  cases  and later  updated  the  table,  summarizing  the  ten  additional  cases. *Id.* ¶¶ 85-86.   The  table  was  presented  to  the  credentials committees  and  medical  executive  committees  of  both  hospitals.

*Id.* ¶ 87.   According to Williams, Morley and Hannay "misrepresented the reviewers' findings" about some of the cases and labeled other cases as "standard met but room for improvement" even though "the room for improvement related to management decisions made by physicians other than" Williams. *Id.* ¶ 88.   Williams also alleges that Weldon and Morley manipulated his surgical complication rate "to create the false impression that [his] surgical complication rate was higher than that of other surgeons at Doctors Hospital for similar types of cases." *Id.* ¶¶ 90-103.

On July 1, 2010, "Morley summarily suspended [Williams's] privileges at Doctors Hospital." *Id.* ¶ 107.   Sass notified Williams of the suspension but did not give Williams the reasons for the suspension. *Id.* ¶ 109.   The suspension included all procedures, including Lap Band procedures and endoscopies. *Id.* ¶¶ 110-111.   Morley suspended Williams's privileges at the Medical Center on July 2, 2010. *Id.* ¶ 113.

Williams requested reinstatement of his privileges. *Id.* ¶ 124.   In support of his request, Williams submitted the report of an independent doctor who had reviewed the sixteen cases and concluded that they did not warrant any adverse action on Williams's privileges. *Id.* ¶¶ 123-124.   The credentials committee at Doctors Hospital, which included Weldon, Ray, Miller and Wilson, voted to deny the request for

reinstatement, but the medical executive committee of Doctors Hospital rejected that recommendation on October 21, 2010 and reinstated Williams's privileges, subject to continuation of the proctorship that had been imposed prior to the suspension. *Id.* ¶¶ 125-126.  Weldon made a motion for the Doctors Hospital medical executive committee to reconsider its decision to reinstate Williams, and on November 2, 2010 the Doctors Hospital medical executive committee voted on the motion and denied Williams's request for reinstatement.  *Id.* ¶¶ 127-128. The Medical Center medical executive committee voted to grant Williams's request for reinstatement, subject to a reportable proctorship or an additional year's training.  *Id.* ¶ 129.

Williams requested a hearing to challenge the denial of reinstatement at Doctors Hospital and to challenge the conditions of reinstatement at the Medical Center.  *Id.* ¶ 136. Columbus Regional offered Williams a hearing at the Medical Center.  *Id.* ¶¶ 137-139.  According to Williams, Hannay "retracted all his criticism about the six cases" that he had previously reviewed, "except for one criticism about one case" that Williams contends relates to a procedure that Williams did not perform.  *Id.* ¶¶ 140-145.  The hearing was adjourned so that the Medical Center and Williams could negotiate a settlement agreement.  *Id.* ¶ 146.  Williams ultimately informed the Medical Center that he would not execute a

settlement agreement, and he asked for the hearing to resume; he also asked to be reinstated at Doctors Hospital. *Id.* ¶¶ 150-151.

On March 1, 2011, the Doctors Hospital medical executive committee voted to rescind their decision of November 2, 2010 and reinstate their October 21, 2010 decision to restore Williams's privileges, subject to continuation of the proctorship that had been imposed prior to the suspension. *Id.* ¶ 156. The same day, the Medical Center medical executive committee voted to impose a proctorship, which it labeled a "Performance Improvement Plan" similar to the proctorship it had imposed on November 2, 2010, except that "final intraoperative decisions" were to be made by Williams and the proctorship would be non-reportable. *Id.* ¶¶ 157-158.

Williams alleges that Columbus Regional "continued to interfere" with his ability to treat patients at Doctors Hospital, including patients requiring bariatric surgery. *Id.* ¶ 160. According to Williams, Sass refused to allow Williams to schedule fifteen patients for Lap Band surgery at Doctors Hospital. *Id.* ¶ 161. In addition, Williams has interviewed with several hospitals in Florida, Kentucky, Louisiana, Texas and Virginia "but was told that he could not be credentialed as a result of Defendants' unjustified and wanton actions." *Id.* ¶ 173. Williams also "applied to seven different locum

tenens agencies" but "was told that he would not even be considered for locum tenens positions because of Defendants' wanton actions." *Id.* ¶ 174.  In addition, Williams contends that "Weldon's persistent denigration" of Williams "eventually caused The Columbus Clinic to terminate its contract" with Williams. *Id.* ¶ 180.

Williams alleges that the decisions about his medical privileges were motivated by racial bias and that the Columbus Regional Defendants treated "ostensible concerns about the quality of [his] patient care differently from the concerns about the quality of care" of white doctors. *Id.* ¶ 163(x).

**III. Williams's Claims**

Williams brings a claim under 42 U.S.C. § 1981 ("§ 1981") against Weldon, Morley and Hannay, alleging that they intentionally interfered with Williams's ability to form contracts with third parties and interfered with "his equal enjoyment of the laws and proceedings afforded by the Bylaws of Doctors Hospital and The Medical Center." *Id.* ¶ 178. Williams also contends that Weldon caused the Columbus Clinic to terminate its contract with Williams "by continually berating and denigrating" him to members of the clinic. *Id.* ¶¶ 179-180.  Williams further asserts that by suspending his privileges, Defendants "improperly interfered with [his] ability to form contracts with other hospitals" and his

ability to enter contracts with prospective employers.  *Id.* ¶¶ 182, 185 & 187.  Williams further alleges that the suspension of his privileges interfered with his ability "to form a contract to treat twenty-six patients who had already been approved by their insurance companies for Lap Band Procedures, and several patients who were waiting for endoscopic procedures at the time of [his] suspension."  *Id.* ¶ 184. Williams also asserts that even after the suspension was lifted Defendants interfered with his ability to treat Lap Band cases.  *Id.* ¶ 188.  Williams contends that the actions of Weldon, Morley and Hannay were racially motivated.  *E.g., id.* ¶ 187.  Williams also contends that "Columbus Regional is vicariously liable for Morley's racially motivated tortious conduct."  *Id.* ¶ 189.

Williams also brings a claim against Weldon, Morley, Hannay, Duke and Columbus Regional under 42 U.S.C. § 1985(3) ("§ 1985(3)"), contending that their actions were in furtherance of a conspiracy to deprive Williams of his rights, including his right to interstate travel, because of his race.[1] *Id.* ¶¶ 192-203.  Williams also asserts claims against Duke, Sass and Columbus Regional under 42 U.S.C. § 1986, asserting that they could have prevented the damages caused by the

---

[1] Williams alleges that there were conspiracies between Weldon and Morley, Am. Compl. ¶¶ 192-195; between Weldon, Ray and Hung, *id.* ¶ 196; and between Hannay, Morley and Dukes, *id.* ¶¶ 197-199.

conspiracy between the other doctors but failed to do so. *Id.*
¶¶ 205-208.

Finally, Williams asserts various claims under Georgia
law, including: claims for violations of the Doctors Hospital
bylaws; defamation; tortious interference with business
relationships; and intentional infliction of emotional
distress. Williams's wife Nicole Williams also brings a claim
against all Defendants for loss of consortium.

DISCUSSION

**I.   Williams's § 1981 Claims**

A.   <u>Elements of a § 1981 Claim</u>

Section 1981 "creates a federal right of action for
victims of certain types of racial discrimination." *Jimenez
v. Wellstar Health Sys.*, 596 F.3d 1304, 1308 (11th Cir. 2010).
"To state a claim for non-employment discrimination under §
1981, a plaintiff must allege (1) he is a member of a racial
minority, (2) the defendant intended to racially discriminate
against him, and (3) the discrimination concerned one or more
of the activities enumerated in the statute." *Id.* (citing
*Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1235
(11th Cir. 2000)). The rights enumerated in § 1981 include
the right "to make and enforce contracts, to sue, be parties,
give evidence, and to the full and equal benefit of all laws

12

and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).

Defendants do not dispute that Williams is a member of a racial minority.  Defendants also cannot seriously dispute that Williams sufficiently alleged that Defendants took the challenged actions because of Williams's race.  Defendants contend, however, that Williams failed to allege that the discrimination concerned one or more of the activities enumerated in § 1981.  Williams asserts that Defendants interfered with "his equal enjoyment of the laws and proceedings afforded by the Bylaws of Doctors Hospital and The Medical Center."  Am. Compl. ¶ 178(b).  Williams also contends that Defendants interfered with his right to contract in three different ways:  (1) Weldon interfered with Williams's contractual relationship with the Columbus Clinic, (2) Defendants interfered with Williams's ability to treat his existing patients, and (3) the suspension interfered with Williams's ability to form contracts with prospective employers.

The consistent flaw that is fatal to Williams's Complaint is that each of his claims has as an essential factual predicate the termination of his hospital privileges.  Whether the claim is based directly upon the termination of those privileges or is indirectly connected (such as his employment

13

termination claim), the termination of those privileges is
essential to each of his claims.  Unfortunately for Williams,
the Eleventh Circuit in *Jimenez* held that under Georgia Law
hospital privileges do not create a protectable legal interest
that a physician may vindicate via a § 1981 claim.  With this
backdrop, the Court addresses each of Williams's specific
theories in turn.

    B.    <u>Interference with Equal Enjoyment of the Laws Claim</u>

Williams claims that Defendants interfered with "his
equal enjoyment of the laws and proceedings afforded by the
Bylaws of Doctors Hospital and the Medical Center."  *Id.* ¶
178(b).  Section 1981 provides that all persons shall have the
right "to the full and equal benefit of all laws and
proceedings for the security of persons and property."  42
U.S.C. § 1981(a).  To state a claim under the equal benefit
clause of § 1981, a plaintiff must "identify a relevant law or
proceeding for the 'security of persons and property'" and
must allege that the defendants deprived him "of 'the full and
equal benefit' of this law or proceeding" because of racial
animus.  *Phillip v. Univ. of Rochester*, 316 F.3d 291, 298 (2d
Cir. 2003) (quoting § 1981(a)).

Even if the Court were to conclude that the hospital
bylaws at issue here were "laws" or "proceedings" within the
meaning of § 1981, Williams's equal benefit claim fails

14

because the bylaws do not protect a liberty or property interest and are therefore not "for the security of persons and property."   Williams appears to contend that the hospitals' bylaws guaranteed him the right to continued medical privileges at Doctors Hospital and the Medical Center unless certain conditions were met; he alleges that Defendants violated the hospitals' bylaws by failing to comply with the "prerequisites for summary suspension."   Am. Compl. ¶¶ 181, 183.   Under Georgia law, "medical staff bylaws, which govern medical staff privileges, do not create a contractual right to the continuation of those privileges." *Jimenez*, 596 F.3d at 1309.   Moreover, denial of a right to continued medical privileges at a specific hospital would not implicate a liberty interest. *Cf. Ming Wei Liu v. Bd. of Trs. of Univ. of Ala.*, 330 F. App'x 775, 780-81 (11th Cir. 2009) (per curiam) (finding no claim for violation of liberty interest because plaintiff's claim was based on the loss of a specific employment opportunity and not a complete denial of "his freedom to pursue employment in his chosen field").   Finally, the denial of a right to continued medical privileges at Doctors Hospital and the Medical Center does not implicate a property interest because in Georgia, physicians do not have a property interest in maintaining medical staff privileges.

*Jimenez*, 596 F.3d at 1310.   For all of these reasons, Williams's § 1981 equal benefit claim fails and is dismissed.

C.   Interference with Contract Claims

In addition to his § 1981 equal benefit claim, Williams also asserts § 1981 contract interference claims.  "To state a claim under § 1981 for interference with a right to contract, 'a plaintiff must identify an impaired contractual relationship under which the plaintiff has rights.'" *Jimenez*, 596 F.3d at 1309 (quoting *Kinnon v. Arcoub, Gopman & Assocs.*, 490 F.3d 886, 890 (11th Cir. 2007)).  A plaintiff must also show that the defendant's interference caused the impaired contractual relationship.  *E.g., Kinnon*, 490 F.3d at 892.

1.   *Interference with Columbus Clinic Contract*

Williams alleges that "Weldon intentionally and specifically interfered with the Plaintiff's actual contract with The Columbus Clinic by continually berating and denigrating the Plaintiff to members of The Columbus Clinic." Am. Compl. ¶ 179.  Williams further asserts that the Columbus Clinic terminated its contract with Williams because of "Weldon's persistent denigration of the Plaintiff." *Id.* ¶ 180.  Plaintiff's allegations are vague and conclusory.  The focus of Williams's Complaint is his loss of medical staff privileges at two Columbus hospitals, allegedly because of the discriminatory acts of the Defendants.  Because Williams has

16

no protected interest in the continuation of his hospital privileges, he has no claim arising from the loss of those privileges. *See Jimenez*, 596 F.3d at 1309-10. Therefore, to survive a motion to dismiss, Williams's claim against Weldon must be based on conduct by Weldon that caused the Columbus Clinic to terminate him unrelated to the loss of his hospital privileges. Although Williams does summarily allege that Weldon had something to do with his termination by the Columbus Clinic, he does not allege how, beyond Weldon's role in the investigation of Williams's hospital privileges, Weldon was involved. Williams does not allege that Weldon actually had any authority to terminate his employment with the Columbus Clinic or had sufficient influence as a third party to cause Williams's termination. Moreover, while Williams alleges that the Columbus Clinic supported him after the initial proctorship was imposed in May 2010, Am. Compl. ¶ 180, Williams does not allege that the Columbus Clinic continued to support or employ him after Williams could no longer perform surgeries in Columbus because his medical privileges were suspended at the only two hospitals in town where he was credentialed.

It would be sheer speculation to conclude that some unspecified comment by Weldon led to the termination of Williams's employment by the Columbus Clinic as compared to

the more likely reason that a surgeon who had lost or limited hospital privileges could no longer do the job he was hired to do.   Williams's claim against Weldon is essentially that Weldon wrongfully interfered with his hospital privileges, which ultimately resulted in the termination of his employment with Columbus Clinic.   Since Williams cannot state a § 1981 claim based on the termination of his hospital privileges and because no other specific facts are alleged as the reason for the termination of his contract with the Columbus Clinic, the Court finds that Williams's Complaint simply does not include sufficient factual allegations regarding this claim "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.   Likewise, the allegations do not "raise a reasonable expectation that discovery will reveal evidence of" Williams's claims.   *Id.* at 556.   For these reasons, the Motion to Dismiss is granted as to this claim.

       2.   *Interference with Williams's Existing Patients*

Williams also alleges that Defendants interfered with his existing patients and patients who requested to have surgery performed by Williams.   Specifically, Williams alleges that the suspension of his privileges interfered with his ability "to form a contract to treat twenty-six patients who had already been approved by their insurance companies for Lap Band Procedures, and several patients who were waiting for

endoscopic procedures at the time of [his] suspension." Am. Compl. ¶ 184. Williams also asserts that even after the suspension was lifted Defendants still interfered with his ability to treat approximately fifty Lap Band cases and that he was not allowed to schedule patients for Lap Band surgery at Doctors Hospital. *Id.* ¶¶ 160-161, 188.

Relying on *Jimenez*, Defendants contend that these potential contracts cannot form the basis of a § 1981 claim. In *Jimenez*, the doctor alleged that the hospital's suspension of his medical staff privileges "interfered with his right to contract with patients and third party payors." *Jimenez*, 596 F.3d at 1310. There, the doctor "had access to the patients he treated at [the hospital] only because they were admitted to the hospital while he was on call; thus, his relationship with them was a benefit of the medical staff privileges to which he was no longer entitled." *Id.* Williams argues that *Jimenez* is distinguishable from this case because Williams did not gain access to the patients solely because they were already patients at Doctors Hospital or the Medical Center. However, Williams's claim is based on his allegation that Defendants interfered with Williams's ability to contract with his patients *by denying him access to those hospitals*. In other words, the only way that Defendants interfered with Williams's existing patient relationships was that the denial

19

of hospital privileges prevented him from performing surgeries at The Medical Center and Doctor's Hospital.[2]   Because Williams had no contractual right to continuation of his medical staff privileges, *Jimenez*, 596 F.3d at 1309, the Court cannot conclude that Williams has stated a § 1981 claim based on Defendants' alleged interference with the relationship between Williams and his prospective patients.   The Motion to Dismiss is therefore granted as to this claim.

>           *3.   Interference with Prospective Employers*

Williams also asserts that Defendants' actions caused him to lose employment opportunities with prospective employers. *E.g.,* Am. Compl. ¶¶ 173-174, 185.   While racially motivated interference with a contract does form the basis of a § 1981 claim, interference with a possible future contract cannot. *Jimenez*, 596 F.3d at 1310 (noting that future contracts a doctor might have formed with potential patients were "too speculative to form the basis of a § 1981 claim").   Therefore, Williams cannot base a claim on the loss of prospective employment opportunities, and Defendants' Motion to Dismiss is granted as to that claim.

---

[2] To the extent that Williams alleges that he was denied access to Doctors Hospital and the Medical Center even after the suspension was lifted in 2011, such a denial is not materially different than any other type of interference with Williams's medical staff privileges. Under *Jimenez*, § 1981 simply does not provide a remedy for harm to Williams caused by interference with his hospital privileges because Williams had no contractual right to continuation of his medical staff privileges. *Jimenez*, 596 F.3d at 1309.

## II.  Williams's § 1985(3) Claim

Williams claims that Weldon, Morley, Ray, Hannay, Duke and Columbus Regional acted in furtherance of conspiracies to deprive Williams of his rights, including his right to interstate travel, because of his race.  Am. Compl. ¶¶ 192-203.[3]  "To state a claim under § 1985(3), a plaintiff must allege: (1) defendants engaged in a conspiracy; (2) the conspiracy's purpose was to directly or indirectly deprive a protected person or class the equal protection of the laws, or equal privileges and immunities under the laws; (3) a conspirator committed an act to further the conspiracy; and (4) as a result, the plaintiff suffered injury to either his person or his property, or was deprived of a right or privilege of a citizen of the United States."  *Jimenez*, 596 F.3d at 1312.  "When the alleged § 1985(3) conspirators are private actors, the plaintiff must demonstrate that the

---

[3] Williams also appears to contend that violations of § 1981 can be enforced through § 1985(3).  The Eleventh Circuit rejected this theory in *Jimenez*, so Williams cannot base his § 1985(3) claim on alleged violations of § 1981.  *See Jimenez*, 596 F.3d at 1312 ("[W]e hold conspiracies to violate rights protected under § 1981 are . . . insufficient to form the basis of a § 1985(3) claim.").  Williams further appears to assert that Defendants deprived him of certain protections afforded by the hospitals' bylaws and that the deprivation gives rise to a claim under § 1985(3).  However, "[w]hen the alleged § 1985(3) conspirators are private actors, the plaintiff must demonstrate that the conspiracy was aimed at rights constitutionally protected against private impairment."  *Id.*  Williams's rights under hospital bylaws are not "serious constitutional rights" that are protected by § 1985(3), and he cannot base his § 1985(3) claim on alleged violations of the hospital bylaws.

conspiracy was aimed at rights constitutionally protected against private impairment." *Id.* "These rights include only select serious constitutional rights," including "the right to interstate travel and the right against involuntary servitude." *Id.* (internal quotation marks omitted).

Williams alleges that Defendants conspired to suspend his privileges at Doctors Hospital and the Medical Center because of his race, which in turn adversely affected his ability to obtain credentials at other hospitals. *E.g.,* Am. Compl. ¶¶ 182, 187. Williams alleges that other hospitals where he could not obtain credentials included hospitals outside of Georgia and that the conspiracy to suspend his privileges in Georgia therefore had the "effect" or "result" of interfering with his right to interstate travel. *E.g.*, *id.* ¶¶ 187, 202. To state a claim under § 1985(3), however, Williams must have alleged that the conspiracy's *purpose* was to deprive him of his right to interstate travel. *E.g., Jimenez*, 596 F.3d at 1312; *accord Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (noting that a conspiracy to rob an interstate traveler would not violate criminal counterpart of § 1985(3) unless the predominant purpose of the conspiracy was to impede or prevent the exercise of the right of interstate travel); *cf. Griffin v. Breckenridge*, 403 U.S. 88, 90, 106 (1971) (finding that complaint stated claim under § 1985(3)

because plaintiffs alleged that defendants intentionally drove their truck into the path of the plaintiffs' car, blocking its passage over the public highway, and then severely beat the plaintiffs with the intent to impede their right to interstate travel).

Though Williams claims that the alleged conspiracies resulted in an impairment of his ability to obtain a job outside of Georgia, he did not allege that the purpose of the alleged conspiracies was to deprive him of his right to interstate travel. Accordingly, his Complaint fails to state a claim under § 1985(3), and that claim is therefore dismissed.

### III. Section 1986 Claim

"Under 42 U.S.C. § 1986, a defendant may be liable if he knew of a § 1985 conspiracy and failed to prevent it, despite having the power to do so." *Johnson v. Wilbur*, 375 F. App'x 960, 964 (11th Cir. 2010) (per curiam). Given that a § 1986 claim is derivative of a § 1985 violation, *id.*, and that Williams's Complaint fails to state a claim under § 1985(3), the Complaint likewise fails to state a claim under § 1986, and that claim is therefore dismissed.

CONCLUSION

As discussed above, Defendants' Motions to Dismiss (ECF Nos. 19 & 27) are granted as to Williams's federal law claims.

There are no claims remaining over which the Court has original jurisdiction.   The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, and those claims are dismissed without prejudice.   *See* 28 U.S.C. § 1367(c)(3) (stating that district courts "may decline to exercise supplemental jurisdiction over" a state law claim if "the district court has dismissed all claims over which it has original jurisdiction").   The Columbus Regional Defendants' Motion to Strike (ECF No. 21) is moot.   Having dismissed all of the claims in this action, the Court directs the Clerk to terminate the action.

IT IS SO ORDERED, this 1st day of February, 2012.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE